UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOLENA BROWN,

                                                  Civil Case No. 23-cv-11768

       Plaintiff,

v.                                           HON. MARK A. GOLDSMITH

FCA US LLC/STELLANTIS,

       Defendant.

_____/

## OPINION & ORDER GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt. 25)

Plaintiff Jolena Brown, filed this lawsuit alleging retaliation and discrimination on the basis of age, race, and sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and the Michigan Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. L. § 37.2101, et seq., after her employment was terminated by Defendant FCA US, LLC (FCA). Before the Court is FCA's motion for summary judgment (Dkt. 25). For the reasons that follow, the Court grants in part FCA's motion with respect to Brown's Title VII claims and dismisses without prejudice Brown's claims under the ELCRA.[1]

## I.      BACKGROUND

Brown is a 48-year-old African American woman who worked at FCA from 1999 until her termination in January 2021. Brown Dep. at PageID.161, 176, 190, 267 (Dkt.25-2). Although Brown worked in several labor relations roles during her time at FCA, her allegations of

---

[1] Because oral argument will not aid the Court's decisional process, the motion will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). In addition to the motion, the briefing includes Brown's response (Dkt. 26) and FCA's reply (Dkt. 29).

discrimination and retaliation begin with her position as an Employee Relations Lead for Assembly and Stamping at FCA's headquarters, which she assumed beginning in April 2016. Richie Decl. ¶ 2 at PageID.556 (Dkt. 25-16). Her supervisor, Roy Richie, had previously worked with Brown "for many years" and had regarded her as a "top performer." Id. ¶¶ 3–4. However, Riche "noticed a marked difference in the level and quality" of Brown's performance beginning in 2017. Id. Whereas Richie had rated Brown's performance as a "8" in the Performance and Leadership Assessment (PLM) in 2016, by the first half of 2017, Riche no longer believed that Brown's performance met this level and quality. Id. ¶ 4.

In August 2017, Brown was transferred to Mopar, another FCA location, where she worked as a Labor Relations Supervisor under Stephanie McDonough. Id. ¶ 5. Brown's performance did not improve at Mopar. Id. Accordingly, in preparing the 2017 PLM for Brown, Richie and McDonough agreed to a rating of "5" for that year, down from "8" a year prior. Id. ¶ 6. Unbeknownst to Richie, McDonough lowered the rating further to a "4." Id.

Brown internally filed a complaint of racial discrimination against McDonough in February 2018 after receiving her PLM score of "4." 2018 Discrimination Compl. at PageID.425 (Dkt. 25-7). In her complaint, Brown alleged that McDonough had "rated her low on her 2017 PLM without regard to her performance" and that McDonough "purposely avoid[ed] [Brown] and other African American team members." Id. FCA used an external investigator to investigate the complaint because Brown was a member of the human resources staff, consistent with FCA's policies. 2018 Investigation Closing Letter at PageID.430 (Dkt. 25-8); FCA Policy No. 3-6 at PageID.381 (Dkt. 25-5). The investigator interviewed Brown and six witnesses, Brown Dep. at PageID.199, and concluded that there was no violation of FCA's discrimination policy, 2018 Investigation Closing Letter at PageID.430.

Following the investigation, FCA revised Brown's PLM score to "5" as initially agreed to by Richie and McDonough.  Revised 2017 PLM at PageID.564 (Dkt. 25-17).  The revised PLM noted that Brown could improve in "her ability to meet deadlines," "hold[ing[ herself accountable on following-up or meeting target dates," "driv[ing] . . . situation[s] to resolution," and "prioritiz[ing] and communicat[ing] her priorities."  Id.  Brown "considered [the complaint] resolved," and Brown made no further complaints of discrimination against any supervisors or FCA during the remainder of her employment the company.  Brown Dep. at PageID.200–202.

Brown's performance did not improve in 2018, and she received a "5" on her 2018 PLM as well.  Richie Decl. ¶¶ 8–9 at PageID.557.  By October 2018, Brown was therefore transferred to a new role as a Union Relations Specialist at Auburn Hills.  Id.  At Auburn Hills, Brown alleges "experience[ing] an issue with [her] supervisor treating a white male coworker preferentially, including taking him out to lunch and chit-chatting with him while refusing to speak to [her]."  Brown Decl. ¶ 6 (Dkt. 28-1).  Brown did not stay at Auburn Hills long.  Within a few months, in April 2019, she was transferred to a Labor Relations Supervisor position at the Sterling Heights Assembly Plant (SHAP).  Brown claims that she was transferred because "the facility needed help 'cleaning the place up.'"  Id. ¶ 7.

At SHAP—which would be her final position at FCA—Brown worked under the direct supervision of Ed Novacco.  Novacco Decl. ¶ 1 at PageID.356 (Dkt. 25-3).  As part of her role, Brown was responsible for overseeing and supervising labor relations representatives, addressing grievances involving the labor union and members belonging to the union, tracking and addressing issues with employee attendance, and addressing disciplinary issues involving labor union members.  Brown Dep. at PageID.202–203.  Novacco also supervised "talent managers," but the talent managers were solely responsible for the "non[-union]-represented management

workforce," whereas Brown was "responsible for servicing . . . [the] union-represented workforce."  Richie Dep. at PageID.545 (Dkt. 25-15).

Novacco states that he immediately became concerned that Brown was "not performing her job duties at a satisfactory level."  Novacco Decl. ¶ 3.  He received "several reports and complaints from union leadership, members of management and Brown's peers regarding [her] lack of communication and unreliability."  Id. ¶ 4.  These complaints alleged that Brown was "repeatedly absent from required meetings," did not provide the "needed coaching, training, or guidance" to other labor relations representatives, did not follow-through on disciplinary issues for union members, did not "recall or memorialize agreements with the union," and made "frequent misstatements or what the union perceived to be lies."  Id. ¶¶ 4–6.

Based on these concerns, Novacco met with the Human Resources Business Partner, Kelly Bennyhoff, to develop a performance improvement plan (PIP) for Brown.  Id. ¶ 7.  The PIP included specific performance concerns that Novacco expected Brown to rectify with discrete tasks and objectives to be completed in 30-, 60-, and 90-day intervals.  Id. ¶ 8.  Meetings were scheduled at each of these intervals, with Brown instructed to bring relevant documents to the meetings.  Id.; Mot. Summ. J. ¶ 29.  The PIP expressly stated that "[f]ailure to meet the Action Plan of this Performance Improvement Plan may result in discipline, up to and including termination of employment."  PIP at 11 (Dkt. 25-10).

Brown claims that she was placed on a PIP not because of performance issues but because she "refused to pay some union employees as per corporate guidance because [she] identified discrepancies in their reported time."  Brown Decl. ¶ 8.  Because she flagged these issues, Brown alleges that "union representatives bec[ame] upset and complain[ed] to [Novacco] about [her] actions."  Id. ¶ 11; July 2019 Letter at PageID.636 (Dkt. 28-2).  These complaints from union

representatives to Novacco, Brown suggests, led to "escalating scrutiny and hostility."  Resp. to Mot. at 15(Dkt. 26).  And Brown claims that on one occasion, Novacco requested "confidential information" regarding another employee from her and her refusal to do so "bother[ed] him." Brown Dep. at PageID.271–272.

On October 2, 2020, Novacco and Bennyhoff informed Brown of her placement on PIP. Novacco Decl. ¶ 9.  Brown did not "refute [any] concerns" or "provide explanations for any of the deficiencies" identified in the PIP.  Id.  The first 30-day review meeting was then held on November 2, 2020.  Id. at ¶ 10. Of the fifteen tasks expected to be completed, Brown only completed one task.  PIP at 4–7.  She also denied making any changes to specific "processes[es]" flagged by the PIP, such as for reporting timekeeping and attendance to operating management.  Brown Dep. at Page ID.209–211.  Brown disagrees that she did not achieve the other stated objectives, but she does not "recall" showing Novacco any relevant documents that would validate this progress. Brown Dep. at Page ID.206–216.  Novacco recalls that Brown was "either silent or told [him] that [he] would hear from her lawyer" throughout the meeting.  Novacco Dep. ¶ 10.  Afterwards, Novacco sent an email to Brown reiterating the "unsatisfactory progress" made towards completion of the PIP and questioning whether her "abrupt departure from the meeting cast doubt on [her] commitment to completing the PIP."  30 Day Performance Review Letter at PageID.522 (Dkt. 25-12).  Novacco also reminded Brown that "failure to demonstrate and maintain satisfactory improvement throughout and after the PIP may be grounds for termination."  Id.  Brown simply responded: "Totally DISAGREE with what you have stated in this email as well as the threat sent." Id.

In the 60-day review meeting on December 1, 2020, Brown again was marked as making "unacceptable" progress towards her action items.  PIP at 8.  The review flagged specific examples

of ongoing deficiencies including "communication of . . . team[] schedules and shift coverages," "[l]ack of ownership of union flags and responding to union pay practice inquiries," "inaccurate[]" reporting of payments, and absence of any "evidence of completion of the 30 day & 60 day required" trainings.  Id. at 8–9.  Brown testified at her deposition that she was "not sure what the reason was" for her failure to complete the training modules and that she had forwarded certain requested documentation to the relevant department but "it was their fault they . . . didn't process it."  Brown Dep. at Page ID.246–247.  Brown maintains that she made more progress towards the PIP goals than reflected in the report but did not bring any documents to the review to confirm this progress.  Id. at PageID.248–249; Novacco Decl. ¶ 13.

Prior to the 90-day review meeting, Novacco and Bennyhoff reviewed Brown's progress and "agreed that [they] still had no evidence Brown had completed the vast majority of the PIP requirements and that Brown's performance overall remained unsatisfactory."  Id. ¶ 14.  The final review summary notes: "During this [PIP] process, the action items contained herein were by and large not completed, nor attempted.  In addition to these specific items, the lack of response to [Brown's] customers and the lack of attention and development of her team remain unacceptable."  PIP at 11.  Novacco and Bennyhoff jointly made the decision to fire Brown and noted that "the reason for the termination . . . was a lack of ability to meet the requirements of the performance improvement plan."  Bennyhoff Dep. at PageID.439 (Dkt. 25-9).  Prior to issuing the decision to Brown, the human resources department was also involved in "review[ing] the checkpoints . . . to ensure that the manager's determination on completion of the plan [wa]s appropriate."  Bridges Dep. at PageID.504–505 (Dkt. 25-11).

Novacco and Bennyhoff met with Brown on January 4, 2021, her 90-day review meeting, to communicate that she was being terminated for failure to complete her PIP.  Novacco Decl. ¶

16.  Novacco and Bennyhoff deny that the termination decision was based on Brown's race, age, or sex or that they had any knowledge of Brown's 2018 discrimination complaint against McDonough.  Novacco Decl. ¶¶ 17–18; Mot. Summ. J. at 18.

Brown filed a complaint with the Equal Employment Opportunity Commission (EEOC) on October 30, 2021, ten months after her termination.  EEOC Charge at PageID.530 (Dkt. 25-14).  She then brought this action alleging discrimination and retaliation under Title VII (Counts I, III, V) and ELCRA (Counts II, IV, VI, VII). Compl. at ¶¶ 18–99 (Dkt. 1).  Specifically, Brown alleges that she "experienced discrimination on the basis of age, race, [and] sex" during her employment at FCA because she was "treated more harshly and unfairly than others[]" and that she experienced "retaliation" because she "reported issues to management regarding discrimination by [her supervisors] on the basis of prohibited categories." Id. ¶¶ 9–11.  FCA now moves for summary judgment on all counts.  Mot. Summ. J. at PageID.127-128.  For the reasons outlined below, the Court (i) grants FCA's motion with respect to the Title VII claims (Counts I, III, V) and (ii) dismisses without prejudice Brown's claims arising under ELCRA (Counts II, IV, VI, VII).

## II.    ANALYSIS[2]

The Court begins by addressing Brown's discrimination and retaliation claims arising under Title VII and then briefly considers Brown's claims under ELCRA.

### A.    Brown's Claims Under Title VII

---

[2] In assessing whether a party is entitled to summary judgment, the Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007).  If a movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," the Court will grant the motion. Fed. R. Civ. P. 56(a).  If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can only survive summary judgment by presenting evidence showing there is a genuine issue for trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1986).

Title VII makes it an "unlawful employment practice for an employer . . . to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1).  Title VII also prohibits an employer from "discriminat[ing] against any of his employees . . . because he has opposed any practice made an unlawful employment practice [under Title VII], or because he has made a charge, testified, assisted, or participated in an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a). Brown brings both a sex and race discrimination (Counts III and V) and retaliation (Count I) claim under Title VII.  For the reasons that follow, the Court concludes that Brown has failed to put forth evidence sufficient to make a prima facie showing of either sex and race discrimination or retaliation under Title VII.

### 1.    Sex and Race Discrimination Claim Under Title VII

A plaintiff may prove discrimination under Title VII either by introducing direct evidence of discrimination or by providing circumstantial evidence supporting an inference of discrimination.  See Hardy v. Eastman Chem. Co., 50 F. App'x 739, 741 (6th Cir. 2002); Kline v. Tennessee Valley Auth., 128 F.3d 337, 348 (6th Cir. 1997).  Direct evidence of discrimination is evidence that "if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  White v. Columbus Metro. Hous. Auth., 429 F.3d 232, 238 (6th Cir. 2005) (punctuation modified).  If relying on indirect evidence, the plaintiff must show that: "(1) she is a member of a protected class, (2) she was subjected to adverse employment action, (3) she was qualified [for the position], and (4) she was treated differently than similarly-situated . . . employee[s] [outside the protected class] for the same or similar conduct."  McClain v. NorthWest Cmty. Corr. Ctr. Jud. Corr. Bd., 440 F.3d 320, 332 (6th Cir. 2006).  If a plaintiff presents sufficient evidence to establish a prima facie case, the burden shifts to the defendant to

8

provide a "legitimate, nondiscriminatory reason" for the adverse action.  Id. at 332.  If so, the burden then shifts back to the plaintiff to "provide evidence from which a jury could find that [the defendant's] stated reason is merely pretextual."  Id. (citing Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 253 (1981)).

Brown offers no direct evidence of race or sex discrimination.  The parties therefore contest whether there is sufficient indirect evidence to make a prima facie showing of discrimination.  FCA does not dispute that Brown, as an African American woman, is a member of protected classes covered under Title VII or that she was qualified for her position.  Resp. to Mot. at 18.  The parties, however, disagree about the nature of the adverse employment action that is actionable and whether Brown was treated differently than males or non-African American employees in a similar position.  See Mot. Summ. J. at 22–25; Resp. to Mot. at 19–23.  The Court concludes that although Brown's placement on a PIP and eventual termination qualifies as adverse employment action, she has failed to establish a prima facie case of race or sex discrimination because she has offered no evidence of similarly-situated employees from non-protected classes who were treated differently.  Because Brown has not established a prima facie case, the Court does not need to engage in the burden-shifting analysis or inquire into the possibility of pretext.  Gantt v. Wilson Sporting Goods Co., 143 F.3d 1042, 1048 (6th Cir. 1998) ("Because [plaintiff] has not established a prima facie case of . . . discrimination . . . the court's analysis is over and there is no need to address the question of pretext.").

### i.   Adverse Employment Action

Title VII does not set "a general civility code for the American workplace."  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998).  So, an adverse employment action for the purposes of a Title VII discrimination claim requires conditions to be "intolerable" to a

reasonable person, <u>Henry v. Lennox Indus., Inc.</u>, 768 F.2d 746, 752 n.3 (6th Cir. 1985), or requires a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 761 (1998). This is a higher standard than for a retaliation claim. <u>See</u> <u>Rogers v. Henry Ford Health Sys.</u>, 897 F.3d 763, 776 (6th Cir. 2018) (noting that a showing of adverse action is "less burdensome" in the retaliation context "than what a plaintiff must demonstrate for a Title VII discrimination claim"). "At a minimum, the employee must be able to show a quantitative or qualitative change in the terms of the conditions of employment." <u>Deleon v. Kalamazoo Cnty. Rd. Comm'n</u>, 739 F.3d 914, 919 (6th Cir. 2014). De minimis actions that are "mere inconvenience[s] or an alteration of job responsibilities" are not actionable. <u>Kocsis v. Multi-Care Mgmt., Inc.</u>, 97 F.3d 876, 886 (6th Cir. 1996).

Brown alleges that she experienced a "pattern of adverse employment actions" including being laterally transferred to different positions which "disrupted her work environment and professional growth"; receiving "unequal treatment by a supervisor" at Auburn Hills who "favored her white male coworker over her" by "engag[ing] with the coworker socially . . . while refusing to interact with Plaintiff"; and receiving an "unwarranted PIP" that ultimately resulted in her termination. Resp. to Mot. at 19–21. FCA, by contrast, argues that Brown's termination is the only adverse employment action in this lawsuit. <u>See</u> Mot. Summ. J. at 22. While Brown's placement on the PIP and termination can qualify as an adverse employment action, <u>see</u> <u>Giron v. Tyco Elecs. Corp.</u>, 762 F. App'x 233, 237 (6th Cir. 2019), the Court agrees with FCA that Brown's other allegations do not meet the threshold for an adverse employment action.

Asides from self-serving and subjective affidavits claiming that her transfers affected her "professional growth," Brown does not point to any tangible effect on the terms and conditions of

her employment.  Job reassignments that have no effect on pay or benefits, work hours, or job responsibilities cannot be considered adverse actions sufficient to sustain a discrimination claim. Kocsis, 97 F.3d at 885 ("[R]eassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims.") (citing Yates v. Avco Corp., 819 F.2d 630, 638 (6th Cir. 1987)); Momah v. Dominguez, 239 F. App'x 114, 123 (6th Cir. 2007) (holding that "a purely lateral transfer . . . which by definition results in no decrease in title, pay or benefits, is not an adverse employment action"); Daron v. Premdor Entry System, No. 98-5227, 1998 WL 869960, at *2 (6th Cir. 1998) (holding that a transfer from a warehouse department to a production department did not constitute an adverse action when the employee maintained the same wages and hours).  While Brown suggests that as a condition of these transfers, she was subject to "a lot of work"—which she speculates is "more than one person can do," Brown Dep. at PageID.261—receiving more difficult tasks or less time to complete tasks that are within the scope of job responsibilities do not rise to the level of an adverse employment action, see O'Donnell v. Univ. Hosps. Cleveland Med. Ctr., 833 F. App'x 605, 619 (6th Cir. 2020) (rejecting a claim of adverse employment action when the employee "was not provided the same amount of time" and "given . . . assignments without the same notice" as other employees and "routinely expected to cover additional . . . work").  Neither does the alleged social favoritism or discourteousness by Brown's supervisor at Auburn Hills qualify as an adverse action, simply because Brown may have been "displeased" or because the supervisor displayed a lack of good manners.  See Williams v. Henry Ford Health Sys., No. 17-11650, 2018 WL 3547013, at *3 (E.D. Mich. July 24, 2018).  Brown has failed to offer any evidence that these slights had a material impact on her benefits, responsibilities, or employment and her conclusory statements alone are

11

insufficient.  Accordingly, only Brown's placement on a PIP and eventual termination qualifies as adverse employment action that is actionable for a discrimination claim under Title VII.

### ii.      Treatment of Similarly-Situated Employees Outside the Protected Classes

Accepting that Brown's placement on a PIP and termination qualifies as adverse employment action, Brown offers no evidence from which a reasonable juror could conclude that she was treated differently from similarly situated employees belonging to non-protected classes. Title VII requires that a plaintiff demonstrate that she was treated differently than similarly situated, non-protected employees for the same or similar conduct.  Mitchell v. Toledo Hosp., 964 F.2d 577, 582–583 (6th Cir. 1992).  This requires the plaintiff to not only specifically identify "comparator" employees with the same supervisors, experience level, and job responsibilities, but also to identify how the comparator employee was treated more favorably than the plaintiff that would give rise to an inference of discriminatory animus.  See Rodriguez v. Delta Airlines, Inc., 644 F. App'x 629, 634–635 (6th Cir. 2016); Gragg v. Somerset Tech. Coll., 373 F.3d 763, 767–768 (6th Cir. 2004) (noting that the "evidence must be sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff" (punctuation modified)).  Here, Brown offers no evidence that in being placed on a PIP or terminated for failure to meet her PIP obligations she was "treated differently" than male or white employees who were similarly situated.

First, Brown alleges that she treated "more harshly and unfairly" than "talent managers"—both of whom were white but at least one of whom were female—and received more work and less "communication" than did the talent managers.  See Brown Dep. at PageID.261–265. However, Brown's assertion that she was "more harshly" treated than talent managers at SHAP is improper because "all relevant aspects" of Brown's employment were not "nearly identical" to

12

those of the talent managers.  Humenny v. Genex Corp., 390 F.3d 901, 906 (6th Cir. 2004) (citing

Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 928 (6th Cir. 1999)).  As

Brown herself conceded during her deposition, Brown was not "subject to the same standards,"

did not have the same job responsibilities, and did not "engage[] in the same conduct" as talent

managers, Gray v. Toshiba Am. Consumer Prods., Inc., 263 F.3d 595, 599 (6th Cir. 2001)

(punctuation modified), because she occupied a different position with a "different job

description[]" and different responsibilities, Humenny, 390 F.3d at 906.  See Brown Dep. at

PageID.264–265 (acknowledging that talent managers do not work on "attendance issues" or

"discipline issues" for union employees, do not "track[] union employee attendance," and do not

"adjust[] union grievances," but that these were all within Brown's responsibilities); Riche Dep.

at PageID.545 (noting that talent managers are responsible for "recruiting, training, and

development" of non-union represented workforce whereas the "labor relations function . . . is

responsible for servicing . . . [the] union-represented workforce").

In fact, Brown has failed to identify any male or white employees with similar job

performance histories who were not assigned to a PIP or not terminated; nor does she provide any

evidence that she was replaced in her position by a white or male employee.  Notably, during her

deposition, Brown could not identify a single employee who did not meet their PIP objectives but

were retained.  See Brown Dep. at PageID.258 (Dkt. 25-2).  In failing to identify a single similarly-

situated non-protected employee who received more favorable treatment, Brown cannot meet her

burden of establishing a prima facie case of discrimination.  See Gjokaj v. U.S. Steel Corp., 700 F.

App'x 494, 504-505 (6th Cir. 2017) (rejecting a discrimination claim when plaintiff could not

"identif[y] any other similarly situated . . . employees who engaged in comparable behavior, but

w[ere] not terminated").

13

Brown's other arguments are similarly unavailing.  For the first time in her response, Brown alleges that she was "treated differently than . . . [a] white male coworker, upon her transfer to the Auburn Hills location" where "her supervisor treated her white male coworker more favorably in several respects," such as by "regularly invit[ing] the coworker out to lunch and engag[ing] in casual, friendly conversations with him."  Resp. to Mot. at 22.  Brown claims that this differential treatment marginalized her because "her white male colleague benefited from more favorable interactions and opportunities for professional camaraderie and networking."  Id.  This alleged differential treatment at Auburn Hills must be discounted for several reasons.  Brown provides no evidence of the job title, responsibilities, experience, or performance history of this male employee who she attempts to use as a comparator; instead, she merely relies on a conclusory statement in her brief.  See Resp. to Mot. at 23.  See Mitchell v. Fujtec Am., Inc., 518 F. Supp. 3d 1073, 1011 (S.D. Ohio 2021) ("[A] Title VII claim will typically require at least some degree of detail regarding any comparator employees on which a plaintiff relies in order for the court to evaluate whether an inference of discrimination can be drawn." (punctuation modified)); Rutherford v. Britthaven, Inc., 452 F. App'x 667, 671 (6th Cir. 2011) (noting that a discrimination claim must be judged by comparing the experience of employees with similar job titles, duties, and responsibilities).  Even if the allegation were substantiated, workplace slights, "personal displeasure," Morris v. Oldham Cnty. Fiscal Ct., 201 F.3d 784, 791 (6th Cir. 2000), and "personality conflicts at work that generate antipathy and snubbing by supervisors," Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (punctuation modified), are insufficient to equate discriminatory animus, Morris v. Oldham Cnty. Fiscal Ct., 201 F.3d 784, 791 (6th Cir. 2000), especially when, as here, Brown can identify no evidence that this "snubbing" materially impacted the terms and conditions of her employment.

14

Because Brown has offered no direct evidence implicating discrimination based on a protected class or indirect evidence that she was treated differently than similarly situated male or white employees for the same or similar conduct, Brown has failed to make a prima facie showing of employment discrimination.  The Court thus rejects Brown's sex and race-based discrimination claim under Title VII as a matter of law.

### 2.      Retaliation Claim Under Title VII

The Court next turns to Brown's claim of retaliation.  To establish a prima facie case of retaliation under Title VII, a plaintiff must show that: "(1) he engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action."  Dixon v. Gonzales, 481 F.3d 324, 333 (6th Cir. 2007).  If a plaintiff presents sufficient evidence to establish a prima facie case, the "burden of production of evidence shifts to the [defendant] to articulate some legitimate, nondiscriminatory reason for its actions."  Morris, 201 F.3d at 793 (punctuation modified).  The burden then shifts back to the plaintiff to "demonstrate 'that the proffered reason was not the true reason for the employment decision.'"  Id. (quoting Texas Dept. of Community Affs. V. Burdine, 450 U.S. 248, 256 (1981)).

The parties here dispute all four elements of the prima facie case, including (i) whether Brown was engaged in any "protected activity" that can serve as the basis of a retaliation claim, (ii) whether the parties involved in Brown's firing decision were aware of her "protected activity"; (iii) which actions by FCA and Brown's supervisors qualify as "adverse employment action,"; and (iv) whether there was a "causal connection" between Brown's "protected activity" and the adverse employment action.  The Court concludes that the only protected activity sufficient for a retaliation

claim here is Brown's 2018 complaint against McDonough and that Brown has failed to make a prima facie case of retaliation because (i) she has offered no evidence from which a reasonable juror could infer that the parties involved in the termination decision were aware of the complaint; and (ii) she does not identify a causal relationship between her complaint in February 2018 and her termination nearly three years later in January 2021.  Because Brown has failed to present sufficient evidence to establish a prima facie case, the Court will not perform the burden-shifting framework analysis and grant summary judgment as a matter of law.  See Crane v. Mary Free Bed Rehab. Hosp., 634 F. App'x 518, 526 (6th Cir. 2015) (affirming a district court's summary judgment grant when the employee could not show that the "decision-maker[] knew of the alleged protected activity and she could not establish a causal connection between her protected activity and" adverse employment action).

### i.      Protected Activity

Title VII recognizes two categories of "protected activity" that are actionable.  See Scheske v. Univ. of Mich. Health Sys., 59 F. Supp. 3d 820, 827 (6th Cir. 2014).  First, under the "participation clause," employees are protected for "participat[ing] in any manner in an investigation, proceeding, or hearing under [Title VII]," 42 U.S.C. § 2000e-3(a), that leads to "the filing of a [Title VII] complaint or charge," Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1312 (6th Cir. 1989).  Second, under the "opposition clause," employees are protected when they "oppose[] any practice [that is] an unlawful employment practice under [Title VII]." Niswander v. Cincinnati Ins. Co., 529 F.3d 714, 719 (6th Cir. 2008) (punctuation modified).  This includes "complaining to anyone . . . about allegedly unlawful practices; refusing to obey an order because the worker thinks it is unlawful under Title VII; and opposing unlawful acts by persons other than the employer."  Id. at 721.  "Despite this broad definition, Title VII does not protect all

opposition activity" and all complaints against "unlawful employment practice[s]."  <u>Scheske</u>, 59 F. Supp. 3d at 827 (punctuation modified).  The complaints must be specifically tied to "a practice made unlawful by Title VII" or "discrimination against a protected class."  <u>Id.</u>  In other words, "complaints about management practices or decisions" do not qualify as protected "opposition" activity unless the employee can show specific allegations of "discrimination against a protected class."  <u>Id.</u>  And the allegations of discrimination cannot be "vague" because "[o]therwise, every adverse employment decision by an employer would be subject to challenge under either state or federal civil rights legislation simply by an employee inserting a charge of discrimination."  <u>Fox v. Eagle Distrib. Co.</u>, 510 F.3d 587, 591–592 (6th Cir. 2007) (punctuation modified).

Here, Brown alleges that several of her actions qualify as "protected activity": (i) her 2018 complaint of racial discrimination against McDonough; (ii) her reporting of wage and hour violations and inaccurate time records to human resources in 2019; (iii) her "refusal to handle certain occurrences in a manner that violated company policy;" and (iv) her role as a labor and relations supervisor, which she argues "inherently . . . constitute[s] a protected activity."  Resp. to Mot. at 12–13.  Among these, FCA rightly concedes that the 2018 complaint against Donough qualifies as "protected activity" for the purposes of Title VII.  <u>See</u> Mot. Summ. J. at 16; <u>Wasek v. Arrow Energy Servs.</u>, 682 F.3d 463, 469 (6th Cir. 2012) (holding that "complaining about allegedly unlawful conduct" that plaintiff has "a reasonable and good faith belief" is in violation of Title VII qualifies as "protected activity").  However, FCA contends, and the Court agrees, that none of Brown's other allegations can qualify as "protected activity" under either the "participation clause" or the "opposition clause."

Brown does not develop any explanation for why refusal to comply with what she subjectively believed to be wage and hour violations also implicates conduct prohibited by Title

VII.  Brown attempts to rely on <u>Jackson v. Genesee County Road Commission</u>, 999 F.3d 333 (6th Cir. 2021), to broadly claim that a HR manager's job responsibilities are automatically presumed to involve "protected activity."  <u>See</u> Resp. to Mot. at 13 ("[P]laintiff's role as a Labor and Relations Supervisor inherently involved actions that constitute protected activity.").  But <u>Jackson</u> says no such thing.  The case makes clear that the employee still must show that she opposed unlawful practices and that she had a "reasonable and good faith belief that the practices violated Title VII." 999 F.3d at 346.  Even accepting that FCA was engaged in unlawful practices around reporting of wage and hour violations, Brown has not identified any reason why the company's alleged practices were also in violation of Title VII or involved discrimination or harassment of protected groups.  <u>See</u> <u>Brown v. VHS of Mich., Inc.</u>, 545 F. App'x 368, 374 (6th Cir. 2013) (rejecting an employee's claim that she engaged in "protected activity" by complaining about a "difference in pay between herself and her subordinates" because the employee did not identify the difference as related to "race, sex, or age").  Brown may have a retaliation claim under other federal or state laws, but because the alleged company practices and violations are unrelated to discrimination or harassment, Title VII does not apply.  Therefore, at most, Brown can raise a Title VII retaliation claim on the basis of her 2018 complaint.

### ii.      FCA's Knowledge of Protected Activity

A plaintiff cannot establish a prima facie claim for retaliation if there is no evidence that "'relevant management decisionmakers' knew of plaintiff's 'exercise of protected activity.'"  <u>Bates v. Am. Axle Mfg., Inc.</u>, No. 17-11796, 2018 WL 5095054, at *8 (E.D. Mich. Aug. 3, 2018) (quoting <u>Fenton v. HiSAN, Inc.</u>, 174 F.3d 827, 832 (6th Cir. 1999)); <u>Mulhall v. Ashcroft</u>, 287 F.3d 543, 551 (6th Cir. 2002.  Although "direct evidence of such knowledge or awareness is not required," the

plaintiff must do more than offer "only conspiratorial theories . . . or flights of fancy, speculations, hunches, intuitions, or rumors." Mulhall, 287 F.3d at 552 (punctuation modified).

Accepting that Brown's 2018 complaint was "protected activity" covered by Title VII, offers no more than mere speculation that Novacco and Bennyhoff, who made the decision to terminate her employment, had any knowledge of the complaint. Brown relies on a string of inferences—that her transfer from Mopar to Auburn Hills because of her complaint, that her subsequent transfer from Auburn Hills to SHAP "under the pretext of needing help 'cleaning the place up,'" and the "escalat[ion] into her PIP and ultimately her termination"—were instigated by the 2018 complaint. Resp. to Mot. at 15–16; see Proffitt v. Metro Gov't of Nashville & Davidson Cnty., 150 F. App'x 439, 443 (6th Cir. 2005) (rejecting a "string of inferences . . . [as] too speculative to support the inference that [defendant] knew of [plaintiff's] protected activity when she terminated her"). But not only did Brown concede that she "considered [the 2018 complaint] resolved" after the investigation was completed, Brown Dep. at PageID.200, she has never expressly suggested that Novacco or Bennyhoff were ever aware of the complaint. And both Novacco and Bennyhoff deny any knowledge of the 2018 complaint or that it had any bearing on their actions. Novacco Decl. ¶ 18; Mot. Summ. J. at 18. Accordingly, Brown has offered no evidence to support the inference that the decisionmakers of her termination decision were aware of her protected activity prior to this litigation. Thus, Brown fails to establish a critical element of the prima facie case of retaliation.

###### iii.    Adverse Employment Action

Not every action that an employee dislikes is an "adverse employment action." Kocsis, 97 F.3d at 886. To establish a retaliation claim, a plaintiff must show that they were subject to actions that "a reasonable employee would have found . . . [to be] materially adverse" and that "might

19

have dissuaded a reasonable worker from making or supporting a charge of discrimination."
Burlington N. & Santa F Ry. Co., 548 U.S. at 68 (punctuation modified).  Being placed on
administrative leave, see Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 595–596 (6th Cir.
2007), excluding employees from training lunches necessary for professional advancement,
Burlington, 548 U.S. at 69, and threats of discipline and termination, see Johnson v. Farmington
Pub. Schs., 728 F. Supp. 3d 723, 753 (E.D. Mich. 2024), fall within the scope of conduct that could
deter a reasonable worker.  By contrast, "negative evaluations of performance or conduct" without
effects on wages or professional advancement, Newell v. Central Mich. Univ. Bd. of Trustees, No.
19-11988, 2020 WL 4584050, at *11 (E.D. Mich. Aug. 10, 2020) (citing Primes v. Reno, 190 F.3d
765, 766–767 (6th Cir. 1999), "petty slights, minor annoyances, and simple lack of good manners,"
Blackburn v. Shelby Cnty., 770 F. Supp. 2d 896, 925 (W.D. Tenn. 2011) (quoting Burlington, 548
U.S. at 68), and "alteration[s] of job responsibilities" that do not substantially change the "terms
and conditions of [plaintiff's] employment" are insufficient to claim an adverse action, Smith v.
City of Salem, 378 F.3d 566, 575 (6th Cir. 2004) (punctuation modified). While making a prima
facie case is not onerous, "a showing of some change in employment circumstances is necessary."
Johnson, 728 F. Supp. 3d at 753 (punctuation modified).

Here, Brown alleges that the "adverse action" includes several events including: (i) being
"forced to transfer" to several positions; (ii) "experienc[ing] . . . differential treatment" at these
various positions by having a supervisor "engag[e] with [a male coworker] socially by taking him
to lunch and conversing with him" or receiving more work than "one person can do"; (iii) being
placed on a PIP; and (iv) being terminated.  Resp. to Mot. at 15–17); Brown Dep. at PageID.261.
FCA concedes that Brown's termination in 2021 squarely falls within the types of adverse
employment actions that are covered under Title VII, but rejects Brown's other contentions as

"belated" assertions that cannot be actionable because they did not have any material effect on Brown's employment.  Pl. Reply in Supp. of Mot. Summ. J. at 4 (Dkt. 29).  The Court agrees with FCA's position.

First, notwithstanding that Brown suggests in her deposition that she "left" her position at Mopar to transfer to Auburn Hills—rather than being "forced to transfer" as her motion suggests—the change in placement to Auburn Hills and the subsequent change to SHAP is insufficient to qualify as an adverse employment action because Brown has identified no evidence that the transfers "significantly impact[ed] her professional advancement," position, or wages such that it would have "dissuaded a reasonable person from filing a Title VII claim."  Brown Dep. at PageID.201; James v. Metro. Gov't of Nashville, 243 F. App'x 74, 79 (6th Cir. 2007) (noting that there could not be an adverse action claim because "none of the[] things [the plaintiff] complained about significantly affected her professional advancement" and she "continued to work and [] receive[] the same pay"); Hatcher v. General Elec., No. 98-6304, 2000 WL 245515, at *10–*11 (6th Cir. Feb. 22, 2000) (rejecting an adverse action claim when plaintiff was "transferred from Materials Manager to Customer Service Supervisor" because the "new position" was not "a less distinguished title than [plaintiff's] previous position" and plaintiff "did not suffer any reduction in salary" or "employment benefits").  Brown's conclusory statements that these transfers affected her professional advancement with no evidence in support are insufficient to make a prima facie showing because "subjective impressions as to the desirability of one position over another are not relevant."  Momah, 239 F. App'x at 123 (punctuation modified).

Second, Brown's allegations of being socially ostracized may be inconvenient but does not qualify as adverse action when she can identify no effect on the terms and conditions of her employment—if every "action by an employer that makes an employee unhappy or resentful were

considered an adverse action, Title VII would be triggered by supervisor criticism or even facial expressions indicating displeasure." <u>Primes v. Reno</u>, 190 F.3d at 767 .  Nor does a mere allegation of being "overworked" when the tasks are within the employment responsibilities constitute an adverse employment action.  <u>See</u> <u>Johnson</u>, 728 F. Supp. 3d at 753–754 (rejecting an adverse action claim merely because the plaintiff alleged that "he was required to take on duties that had previously been shouldered by three or four individuals, setting him up for failure" (punctuation modified)).

Although a PIP alone does not constitute an adverse employment action, placement on a PIP that "results in termination may constitute an adverse employment action." <u>Giron</u>, 762 F. App'x at 237.  Therefore, while a reasonable juror could conclude that placement on the PIP—and the resulting termination—constituted an adverse action, Brown's additional claims are not actionable.

### iv.   But-For Causation Between Protected Activity and Adverse Employment Action

Accepting that Brown's 2018 complaint qualifies as "protected activity," her retaliation claim fails because she cannot establish a causal relationship between her complaint from February 2018 and her placement on the PIP and termination nearly three years later in January 2021.  To establish a causal connection, an employee must "proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action," <u>EEOC v. Avery Dennison Corp.</u>, 104 F.3d 858, 861 (6th Cir. 1997) (punctuation modified), and that "but-for her protected activity, her employment would not have been terminated," <u>Jackson</u>, 999 F.3d at 349 n.5 ("[T]he causation element of Title VII and the ELCRA are the same.").  "Causality can be shown with either direct evidence or circumstantial evidence." <u>Id.</u> at 349.  This is not an "onerous" burden for the plaintiff "[a]t the prima facie stage," but does require "evidence that the defendant treated the

plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights." Jackson, 999 F.3d at 349 (punctuation modified); Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs., 974 F.3d 652, 664–665 (6th Cir. 2020) (noting that the Sixth Circuit considers as circumstantial evidence "where a defendant took adverse action against a plaintiff justa few months after learning of his or her protected activity"). However, a gap of more than six months between protected activity and termination generally "does not raise the inference that the protected activity was the likely reason for the adverse action," Blizzard v. Marion Tech. Coll., 698 F.3d 275, 289 (6th Cir. 2012) (punctuation modified); Lindsay v. Yates, 578 F.3d 407, 418 (6th Cir. 2009) (noting that an inference can be drawn only if "an adverse employment action occurs very close in time after an employer learns of a protected activity"), especially if there are intervening concerns about job performance, Fletcher v. U.S. Renal Care, 709 F. App'x 347, 353 (6th Cir. 2017) (rejecting but-for causation when there were repeated concerns of charting errors by a nurse, even though the nurse had filed a discriminatory complaint a "few weeks" prior).

Here, Brown argues that there is a "clear causal connection" between her "2018 protected activity" and "her eventual termination."  Resp. to Mot. at 14-15.  Asides from this cursory conclusion, Brown does not explain why or how the 2018 complaint could have instigated her placement on a PIP or eventual termination.  See Balmer v. HCA, Inc., 423 F.3d 606, 615 (6th Cir. 2005) ("The mere fact that an adverse employment decision occurs after a charge of discrimination is not, standing alone, sufficient to support a finding that the adverse employment decision was in retaliation to the discrimination claim."), abrogated on other grounds by Fox v. Vice, 563 U.S. 826 (2011).  These decisions were made nearly three years after her initial complaint by different supervisors at different locations and while Brown was working in a different role.  See Crane,

634 F. App'x at 526 ("An employment decision cannot be caused by protected activity if the decision-maker did not know about the protected activity.").  Further, Brown has not provided any evidence suggesting that Novacco and Bennyhoff, who assumed responsibility for the termination decision, were even aware of the 2018 complaint or that it had any bearing on their actions.  Novacco Decl. ¶ 18; Mot. Summ. J. at 18.

Alternatively, Brown also tries to rely on temporal proximity.  Resp. to Mot. at 14 ("Plaintiff asserts that temporal proximity between her [2018] complaint and her termination is sufficient to establish causation . . . .").  Not only is there a weak inference to be made from temporal proximity here—the 2018 complaint was filed nearly three years before her eventual termination—but Brown also rejects any role the intervening performance issues may have played in the termination decision.  When there is a "significant length of time" between a discrimination charge and termination and there is "evidence of Plaintiff's . . . performance problems that occurred in the interim, no reasonable jury could conclude . . . that there exists a causal connection between Plaintiff's decision to file a discrimination charge and [the defendant's] decision to terminate her."  Bradley v. XDM, Inc., No. 15-14154, 2017 WL 467407, at *7 (E.D. Mich. Feb. 3, 2017); see also Strouss v. Mich. Dep't of Corr., 250 F.3d 336, 344 (6th Cir. 2001) (noting that three years was a "significant gap in time between the protected activity and the adverse action" that cannot be used to "give rise to an inference of a retaliatory motive").  And, perhaps most notably here, the performance issues were documented as early as 2017, well before Brown submitted her discrimination complaint.  Riche Decl. ¶¶ 4–6 (noting that Brown's PLM score declined from "8" to a "5" from 2016 to 2017, prior to the filing of the discrimination complaint).  Because Brown does not establish a material dispute that would lead a reasonable juror to infer that but for the

submission of her 2018 complaint, she would not have been terminated, she fails to establish a prima facie case for retaliation.

**B.      Brown's Claims Under ELCRA**

Brown also brings sex, race, and age discrimination claims (Counts IV, VI, and VII, respectively) and retaliation claims (Count II) under ELCRA.  Because the Court grants FCA's summary judgment motion as to the federal claims, the Court will use its discretion to decline to exercise supplemental jurisdiction over the remaining state-law claims by dismissing these claims without prejudice.  28 U.S.C. § 1367(c)(2); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1976) ("[I]f the federal claims are dismissed before trial, . . . the state claims should be dismissed as well."

### III.      CONCLUSION

For the reasons set forth above, the Court (i) grants FCA's motion for summary judgment with respect to Brown's claims under Title VII and (ii) dismisses without prejudice Brown's claims under ELCRA.

Dated:  March 31, 2025                          s/Mark A. Goldsmith
      Detroit, Michigan                          MARK A. GOLDSMITH
                                     United States District Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 31, 2025.

                                    s/Carolyn Ciesla
                                    Case Manager